OPINION OF THE COURT
Ethel B. Danzig, J.
Plaintiff moves for an order granting summary judgment striking the answer of the defendant. Defendant cross-moves for an order dismissing the complaint and granting leave to add a cause of action for an injunction.
The subject building 165 West 26th Street, New York, New York, is registered with the Loft Board as an interim multiple dwelling pursuant to Multiple Dwelling Law article 7-C. The building is owned by S & W Ladies Wear, which is doing business as 165 West 26th Street Associates (plaintiff). Plaintiff, a manufacturer of ladies’ wear, had originally been a lessee of the premises and purchased the building from the prior owner, Loft Management Co., in 1984. Defendant, an artist, has resided and worked in the space comprising the eastern half of the second floor (unit 2E) since June 1978. Before moving in, defendant obtained an assignment of the lease from the prior occupant, L. Don Miller, with the previous landlord’s consent. According to defendant, she paid Miller $5,000 for the fixtures installed by him and has since spent a substantial sum on her own. There is no question that at the time of its purchase of the building, plaintiff knew that residential tenants were occupying a portion of the premises. The building was registered with the Loft Board in January 1983 by the prior landlord. No hardship application was filed prior to the Loft Board’s deadline of June 1983. The most recent lease (to Miller) expired in 1982.
Plaintiff now seeks to remove residential tenants from the building in order to provide space for its business (manufacturing) use. Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code) § 54 (D) provides that a landlord may apply to the proper administrative agency for permission to withdraw a unit from the rental market where he requires (in good faith) the space in connection with a business which he owns and operates. This complaint seeks a declaratory judgment to the effect that the rights of the defendant have been extinguished pursuant to Multiple Dwelling Law article 7-C and Rent Stabilization Code § 54 (D) and seeks a judgment of ejectment. However, the maximum relief that plaintiff could obtain from this court is a declaratory *869 judgment that Rent Stabilization Code § 54 (D) applies to the subject unit. Even if the court were to grant such a judgment, plaintiff would still have to apply to the administrative agency (now State Division of Housing and Community Renewal) for permission to withdraw the unit from the rental market.
Defendant’s answer alleges lack of personal jurisdiction and lack of subject matter jurisdiction. In addition, defendant asserts counterclaims seeking recovery for retaliatory eviction, breach of warranty of habitability, harassment and abuse of process. In April 1985, plaintiff served a demand for a bill of particulars with respect to the above. In July 1985, defendant consented to an order precluding her from proving the counterclaims unless she served the bill within 45 days. Since the 45-day period has passed, the counterclaims should be dismissed as abandoned.
Defendant’s claim is that the landlord cannot take advantage of Rent Stabilization Code § 54 (D) because the building has not been brought into compliance with the Building Codes. An examination of the Loft Law and its background indicates that she is correct.
The Loft Law (L 1982, ch 349) was designed to provide a mechanism for the legalization of previously illegal residential occupancy. Landlords are permitted to collect rent, even though the building lacks a residential certificate of occupancy, while the building is being brought into compliance with Building Codes. The costs of legalization can be passed on to the tenants in accordance with the statute and with regulations promulgated by the Loft Board. In return, tenants are protected from eviction even though the residential occupancy previously was illegal, are entitled to have the landlord bring the building up to residential Building Code standards, and are afforded certain protection under rent regulations laws.
Multiple Dwelling Law § 286 (3) provides as follows: "Upon or after compliance with the safety and fire protection standards of article seven-B of this chapter, an owner may apply to the loft board for an adjustment of rent based upon the cost of such compliance. Upon approval by the loft board of such compliance, the loft board shall set the initial legal regulated rent, and each residential occupant qualified for protection pursuant to this article shall be offered a residential lease subject to the provisions regarding evictions and regulation of rent set forth in the emergency tenant protection act of [1974]” (emphasis supplied).
*870 The memorandum of the legislative representative of the City of New York submitted in support of the enactment of the Loft Law, states as follows: "13. Upon building compliance with safety and fire protection standards an owner may apply to the Loft Board for a rent adjustment based on a portion of the reasonable and necessary costs of compliance * * * The loft board would set the initial legal regulated rent of each residential unit which would then be subject to the Rent Guidelines Board increases pursuant to the Emergency Tenants Protection Act.” (1982 McKinney’s Session Laws of NY, at 2482.)
The clear import of the Loft Law is that the rent stabilization system, including its provisions for eviction, do not come into play unless and until the building has been brought into compliance with the code standards. This, of course, does not exclude all grounds for eviction. Loft Board regulation J, filed with the city clerk in June 1983 permits evictions on the grounds that the tenant is not maintaining the unit as a primary residence, that the tenant is committing a nuisance or has caused substantial damage to the landlord’s property or that other grounds for eviction exist under the Real Property Actions and Proceedings Law which are not inconsistent with the Multiple Dwelling Law. The Loft Board regulations do not specifically cover the other grounds for refusal to renew a lease, such as the landlord’s need of the unit for his own use. Since the Loft Board has not issued appropriate regulations, the court will have to interpret that law on its own.
In effect, the Rent Stabilization Code, to the extent that it does not conflict with Multiple Dwelling Law article 7-C, is incorporated by reference into the Loft Law. For example, the Loft Board had the right to promulgate a primary residence rule (Matter of Lower Manhattan Loft Tenants v New York City Bd., 66 NY2d 298). There is no question that Rent Stabilization Code § 54 (D) can be applied to a loft unit; the question is the time, if any, that it becomes applicable. Under Multiple Dwelling Law § 286, the landlord must first bring the building into compliance with fire and safety codes and then offer the tenant a lease at an initial legal regulated rent set by the Loft Board. It appears that at the end of the lease term, the landlord may apply to the administrative agency for permission to refuse to renew the lease in order to acquire the space for its own business use.
Plaintiff argues that it should not be put through the expense of renovating the unit for residential use, only to *871 have to spend thousands of dollars later to reconvert it for business use. Perhaps this is a harsh result, but the Loft Law does not allow for the type of eviction, at this point in time, sought by plaintiff. Moreover, plaintiff purchased the building with knowledge of its mixed use character, and had to be prepared to comply with the statutes designed to protect residential loft tenants.
The Loft Law came about because of a situation that few people had anticipated. In the 1960’s and early 1970’s, as commercial vacancies increased, landlords were happy to find artists and others who were willing to lease space at relatively cheap rents. Unexpectedly, as residential shortages grew, a number of previously "marginal” residential areas became popular. A process known as "gentrification” began to occur, and tenants who had used the space for residential purposes, illegally perhaps, but with the knowledge and acquiescence of the landlords, were faced with wholesale evictions unless something was done. The Loft Law extends rent regulation protection not only against residential gentrification but also commercial gentrification which would otherwise force people from their homes and businesses. In short, plaintiff cannot utilize the building for its own commercial purposes without regard for the rights of residential tenants.
Plaintiff also has a procedural problem. Rent Stabilization Code § 60 requires a landlord to offer a residential tenant a renewal lease between 150 and 120 days before the expiration of the lease. In Crow v 83rd St. Assoc. (116 AD2d 1048 [1st Dept 1986]) the court held, in a primary residence case, that the landlord had to give the tenant at least 120 days’ notice of its intention not to renew the lease. (See, Golub v Frank, 65 NY2d 900.) It appears that Crow and Golub apply not only to primary residence cases but also to certain other grounds for eviction, such as the acquisition by the owner, in good faith, for his own use. In the instant case, the notice could not have been given because there is no current existing lease.
Accordingly, the motion for summary judgment is granted only to the extent that the counterclaims are dismissed. The cross motion is granted insofar as it seeks a dismissal of the complaint and denied as moot insofar as it seeks injunctive relief. Plaintiff shall have leave to apply to the appropriate administrative agency for permission to evict the tenant pursuant to Rent Stabilization Code § 54 (D) (or any subsequently enacted equivalent provision) after compliance with the applicable Building Code standards and at the expiration of a lease *872 to be given to the tenant at an initial legal regulated rent set by the Loft Board.